UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ROBERT E.H. CARLISLE,

                    Petitioner,

v.                                        Case No. 3:04-cv-1005-32TEM

JAMES R. MCDONOUGH,
et al.,

                    Respondents.
_____

**ORDER**[1]

**I. Status**

Petitioner Robert E.H. Carlisle, an inmate of the Florida penal system proceeding *pro se*, initiated this action by filing a Petition for Writ of Habeas Corpus (Doc. #1) (hereinafter Petition) pursuant to 28 U.S.C. § 2254 on October 31, 2003.  On November 13,

_____

[1] Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically.  However, it has been entered only to decide the matter addressed herein and is not intended for official publication or to serve as precedent.

2003, Petitioner's Petition was stricken. <u>See</u> Court's Order (Doc. #5), filed November 13, 2003. On December 30, 2003, Petitioner filed an Amended Petition (Doc. #12) and Memorandum of Law and Facts in Support of Petition for Writ of Habeas Corpus (Doc. #13). Petitioner challenges a 1998 state court (Volusia County, Florida) judgment of conviction for burglary of a dwelling on the following grounds: (1) appellate counsel was ineffective for failure to raise on direct appeal that the trial court erred by failing to conduct a full <u>Nelson</u>[2] inquiry, for failure to conduct a <u>Faretta</u>[3] hearing and by refusing to hear his "oral complaints" concerning counsel's incompetency; (2) trial counsel was ineffective (a) for waiving Petitioner's right to testify at trial without Petitioner's concurrence and without explicitly advising Petitioner that the ultimate decision was Petitioner's, not counsel's, and (b) for dissuading Petitioner from testifying by misadvising him that the State would inform the jury that he was a convicted burglar and impeach him when he testified; (3) the trial court impermissibly infringed upon and substantially interfered with his right to testify by "presenting him with five (5) ultimatums to testify as his own first witness" and interfering with his presentation of witnesses; (4)(a) denial of the right to a fair trial and the right to present an alibi witness, and (b) ineffectiveness of counsel for

---

[2] <u>Nelson v. State</u>, 274 So.2d 256 (Fla. 4th DCA 1973).

[3] <u>Faretta v. California</u>, 422 U.S. 806 (1975).

failure to conduct a meaningful investigation and for failure to interview, depose and properly subpoena Renee Carlisle (Petitioner's wife), his only relevant exculpatory alibi witness; and, (5) trial counsel was ineffective for failure to object when the State substantially prejudiced the defense by informing the jury that Petitioner stole a pistol while in commission of the burglary.

Respondents filed a Response to Petition (Doc. #27) (hereinafter Response) with exhibits in support of their Response.[4] Petitioner was instructed on how to properly respond to a motion to dismiss and/or for summary judgment. See Court's Order (Doc. #35). Petitioner has replied. See Petitioner's Second Amended Reply to State's Response (Doc. #47). Petitioner's exhibits will be hereinafter referred to as "App." See Petitioner's Appendix (Doc. #3), filed October 31, 2003; Petitioner's Motion to Expand (Doc. #44), App. SS; Motion to Expand (Doc. #58), App. SS1B-SS1H.

On February 10, 2006, Petitioner filed a Motion for Summary Judgment (Doc. #52) with exhibits. Respondents filed a Response to Motion for Summary Judgment (Doc. #72) (hereinafter Second Response) with Supplemental Appendix (Doc. #71) (hereinafter Supp. Ex.). This case is now ripe for review.

---

[4] Respondents' exhibits will be hereinafter referred to as "Ex."

## II. Procedural History

On October 23, 1997, Petitioner Carlisle was charged by Information with burglary of a dwelling (a second degree felony) in Volusia County, Florida, in violation of Florida Statutes § 810.02(1) and (3).  Ex. A at 122.  The Information stated:

> In that ROBERT CARLISLE, on or about the 7th day of August, 1997, at or near South Daytona within Volusia County, Florida, did then and there unlawfully enter or remain in a certain dwelling, located at 1835 Seagrave Street, #3 in the County and State aforesaid, without the consent of Leslie Parent, the owner or custodian thereof, while harboring the intent to commit the offense of theft within said dwelling.

Id.  Following a jury trial, Petitioner was found guilty of burglary of a dwelling as charged in the Information.  Id. at 221, Verdict.  On May 7, 1998, Petitioner was sentenced to twenty-five years of incarceration as an habitual felony offender.  Id. at 292-96; see http://www.dc.state.fl.us/ActiveInmates (website for the Florida Department of Corrections).

On appeal, Petitioner, through counsel, raised eight issues: (1) the trial court erred in denying his demand for speedy trial; (2) the trial court erred in failing to conduct an adequate Nelson inquiry regarding Petitioner's motion to discharge his appointed counsel; (3) the trial court erred in denying his motion to suppress because Petitioner's wife did not have the right to waive Petitioner's constitutional right to demand a search warrant for the search of his premises, and his wife's consent to the search

4

was involuntary; (4) the trial court erred in ruling that letters Petitioner wrote to his wife were admissible in violation of the husband/wife privilege; (5) the trial court erred in denying his motion for mistrial after the prosecutor told the jury that Petitioner sold stolen property because he was on drugs; (6) the trial court erred in denying his motion for mistrial when Jean Hiers testified that Petitioner said if he was convicted they would "H.O." him; (7) the trial court erred in denying his motion for judgment of acquittal because the evidence was insufficient to prove the Petitioner entered the premises when the burglary occurred; and, (8) Petitioner's conviction should be reversed because the cumulative effect of the errors committed by the prosecutor and the trial court deprived Petitioner of a fair trial. Ex. D, Initial Brief.  The State filed an Answer Brief, and Petitioner, through counsel, filed a Corrected Reply Brief.  Ex. E; Ex. G.  On May 25, 1999, the appellate court per curiam affirmed without issuing a written opinion.  Carlisle v. State, 736 So.2d 1203 (Fla. 5th DCA 1999); Ex. H.  The mandate was issued on June 11, 1999.  Ex. I.

On or about September 27, 1999, Petitioner filed his first *pro se* motion for post conviction relief pursuant to Fla. R. Crim. P. 3.850, in which he raised nine claims with numerous sub-claims: (1) ineffective assistance of trial counsel because counsel did not allow him to testify on his own behalf although he expressly stated

5

that he desired to do so, and the trial judge substantially interfered and influenced Petitioner to yield to his trial counsel's advice not to testify; (2) ineffective assistance of trial counsel because counsel, Scott Swain and Jane Park, did not investigate and present the exculpatory testimony of his minor children, who complained about witness tampering; (3) ineffective assistance of trial counsel because counsel failed to adequately prepare for trial by investigating, interviewing, locating and deposing potential exculpatory witnesses: Elmer Smith, "J.C." (last name unknown), Rita Rogers and John Slyvestri; (4) ineffective assistance of trial counsel for failure to object, file a motion in limine, move for a mistrial or preserve for appellate review the State's introduction of impermissible collateral crime evidence *i.e.*, the alleged theft of a .25 caliber Beretta pistol while in the commission of a burgalry of a dwelling; (5) ineffective assistance of trial counsel for failure to request a curative instruction, move for a mistrial or preserve for appellate review the prosecution's improper statements in his opening and closing arguments; (6) ineffective assistance of trial counsel for failure to request a <u>Richardson</u>[5] hearing to determine if the State committed a discovery violation when the prosecutor did not disclose to the defense that he was planning to introduce evidence at trial charging Petitioner with the theft of a deadly weapon in

---

[5] <u>Richardson v. State</u>, 246 So.2d 771 (Fla. 1971).

6

commission of a burglary of a dwelling; (7) ineffective assistance of trial counsel for interfering with the trial court's handling of his *pro se* motion to discharge them as counsel and thus depriving him of <u>Nelson</u> and <u>Faretta</u> hearings; (8) ineffective assistance of trial counsel for failure to investigate, interview, depose and impeach Jean Hiers (a State's witness) regarding a letter she sent to Petitioner shortly afer his arrest, which strongly implied that she had an "axe to grind" with Petitioner which prejudiced her testimony at trial; and, (9) ineffective assistance of trial counsel for failure to object and preserve for appellate review the trial judge's instructing the jury on "presumption of intent," an essential element of the crime of burglary, arising from the stealthy entry pursuant to Florida Statute § 810.07 where there was no proof of intent and entry.  Ex. J at 126-232.

On April 27, 2000, the trial court denied grounds one, two, three (Omission C), four, five, six, seven, eight and nine of Petitioner's Rule 3.850 motion.  <u>Id</u>. at 355-76.  The trial court scheduled an evidentiary hearing on ground three (Omissions A and B) concerning trial counsel's failure to adequately prepare for trial by investigating, interviewing, locating and deposing potential exculpatory witnesses:  Elmer Smith, "J.C.", Rita Rogers and John Slyvestri.  <u>Id</u>.  Finally, the trial court appointed counsel on the limited issue raised in ground three (Omissions A and B).  <u>Id</u>.

On January 31, 2002, an evidentiary hearing was conducted, and Petitioner was represented by counsel.  Ex. J at 1-125, Transcript of the Evidentiary Hearing (hereinafter EH Tr.).  On February 6, 2002, the trial court, having heard evidence from both parties at the evidentiary hearing, denied Petitioner's Rule 3.850 motion on ground three (Omissions A and B) "for reasons stated on the record at the January 31, 2002[,] hearing."  Ex. J at 860.

The parties filed appellate briefs.  Ex. K; Ex. L; Ex. M.  On August 20, 2002, the appellate court per curiam affirmed without issuing a written opinion.  Carlisle v. State, 829 So.2d 232 (Fla. 5th DCA 2002); Ex. N.  Petitioner's pro se motion for rehearing was denied on October 2, 2002.  Ex. N1; Ex. N2.  The mandate was issued on October 21, 2002.  Ex. O.

On or about April 23, 2001 (while Petitioner's first motion for post conviction relief was still pending in the trial court and while he was represented by counsel), he filed a pro se second motion for post conviction relief, alleging the discovery of new evidence.  Ex. J at 624-52.  Specifically, he alleged that he was denied a fair trial by the ineffectiveness of counsel for failing to properly serve a defense subpoena for his exculpatory witness, Renee Carlisle.  On May 17, 2001, the trial court entered an order, striking the pro se motion, but noting that Petitioner's counsel may file, if appropriate, an amended Rule 3.850 motion alleging

8

newly discovered evidence. Id. at 669. The trial court granted counsel thirty days to file the amended motion. Id.

On or about March 13, 2001, also while Petitioner's first motion for post conviction relief was still pending in the trial court, Petitioner filed a *pro se* petition for writ of habeas corpus, alleging ineffective assistance of appellate counsel for counsel's failure to raise on direct appeal the following issues: (1) the trial court erred in refusing to allow Petitioner to "air his complaints against counsel" at his Nelson hearing on February 5, 1998; (2) the trial court erred in failing to conduct a full Faretta hearing when Petitioner requested self-representation and moved to discharge counsel; (3) the trial court improperly instructed the jury on the "presumption statute" (Florida Statute § 810.07) involving burglary; (4) the Information was reduced to a nullity when the State amended the Information after the jury was sworn to additionally charge armed burglary and grand theft of a firearm; and, (5) the trial court failed to conduct a Richardson hearing when the State introduced evidence of the theft of a pistol, not referenced in the Information. Ex. P. The State filed a Response to Petition for Writ of Habeas Corpus. Ex. Q. On June 15, 2001, the appellate court denied the petition without issuing a written opinion. Ex. R.

On or about October 13, 2002, Petitioner filed a third *pro se* motion for post conviction relief, raising the following claims:

(1)(a) trial counsel lied to the court when he stated that Petitioner's wife was not under subpoena by his office, and this misrepresentation prejudiced him because, although it was made to obtain the exculpatory hearsay of his wife through his son, the son misspoke while on the witness stand; the son's testimony was improperly admitted; and, trial counsel was ineffective for not interviewing his wife after Petitioner told counsel where his wife could be found, and (b) trial counsel was ineffective for not conducting an adequate pretrial investigation, interviewing and deposing Petitioner's wife.  Ex. S.

On or about November 2, 2002, Petitioner filed a motion to supplement the Rule 3.850 motion, raising the following issue, as ground two:  Renee Carlisle, Petitioner's wife, was available to be questioned concerning the alleged complaints made by Robert Jr. and Cody Carlisle that she was manipulating or pressuring them to change their testimony, and trial counsel failed to make an adequate investigation into these felony witness tampering complaints.  Ex. T.  On December 12, 2002, the trial court denied the motion to supplement.  Ex. U.  On that same day, the trial court denied his Rule 3.850 motion.  Ex. V.  Petitioner's motion for rehearing was denied on January 7, 2003.  Ex. W; Ex. X.

On appeal, Petitioner filed a *pro se* brief.  Ex. Y.  The State declined the opportunity to file an Answer Brief.  Ex. Z.  On March 18, 2003, the appellate court per curiam affirmed without issuing

a written opinion.  Carlisle v. State, 845 So.2d 212 (Fla. 5th DCA 2003); Ex. AA.  Petitioner's motion for rehearing was denied on April 25, 2003.  Ex. BB; Ex. CC.  The mandate was issued on May 14, 2003.

On or about May 6, 2003, Petitioner filed a second *pro se* petition for writ of habeas corpus, alleging ineffective assistance of appellate counsel for failure:

> to ensure that a complete and accurate record was compiled on first direct appeal to present substantive arguments to reviewing court that establish trial counsel gave false and misleading information to the trial judge when he affirmatively denied that Defendant's wife was not subpoenaed by the defense to provide the only relevant, material testimony at the pre-trial suppression hearing, and at trial, that her alleged consent to police to allow private party to search Defendant's van was not freely and voluntarily given, but a product of duress and coercion, and trial counsel prejudiced the outcome of the hearing and the trial by failing to motion the trial court directly to issue a writ of body attachment against wife to appear and testify since she was properly subpoenaed by counsel Jane Park for trial, and trial counsel's deficient performance resulted in the trial court denying the motion to suppress without hearing [the] wife testify about her encounter with the police and relied solely on hearsay to dismiss [the] motion.

Ex. EE at 6.  On May 19, 2003, the appellate court stated:

> The above-styled petition is totally without merit and constitutes Petitioner's ninth appellate collateral challenge regarding his 1997 conviction rendered below for burglary of a dwelling.  The Petitioner's conviction and habitual offender sentence were affirmed in this Court's Case No. 5D98-1302.

11

See also Carlisle v. State, 736 So.2d 1203
(Fla. 5th DCA 1999); See also Carlisle v.
State, 706 So.2d 414 (Fla. 5th DCA 1998) (Case
No. 5D98-405); Carlisle v. State, 773 So.2d
647 (Fla. 5th DCA 2000) (Case No. 5D00-
30[7]0); Carlisle v. State, 829 So.2d 232
(Fla. 5th DCA 2002) (Case No. 5D02-319);
Carlisle v. State, 821 So.2d 293 (Fla. 2002)
(Case No. SC02-656); Carlisle v. State, Case
No. 5D03-377, 2003 Fla. App. LEXIS 4288 (Fla.
5th DCA Mar. 18, 2003). According it is

ORDERED that Petitioner shall file with
this Court and show cause, within thirty days
from the date hereof, why he should not be
denied further *pro se* access to this Court for
any proceeding to further attack the
conviction and sentence rendered below.

Ex. FF. Petitioner responded. Ex. GG.

On July 18, 2003, the appellate court found Petitioner's

response to be meritless and prohibited him from filing any

additional *pro se* appeals, pleadings, motions and petitions

relating to his burglary of a dwelling conviction and sentence.

Carlisle v. State, 849 So.2d 1146 (Fla. 5th DCA 2003) (per curiam);

Ex. HH. Specifically, the appellate court stated in pertinent

part:

This successive petition alleging
ineffective assistance of appellate counsel
creates another one of our "enough is enough"
cases. After a jury trial, Robert E.H.
Carlisle was convicted of burglary of a
dwelling and sentenced as an habitual felony
offender. He appealed, raising eight issues.
This court affirmed his conviction and
sentence on appeal in Carlisle v. State, 736
So.2d 1203 (Fla. 5th DCA 1999). He then began
attacking his conviction and sentence
collaterally.

12

In his current petition, Carlisle again argues some, if not all, of his trial and appellate attorneys were ineffective because his missing wife was not served with a subpoena to testify at his trial. Because the trial court had previously resolved the factual issue of the subpoena against him, that he previously and unsuccessfully raised in this court's case No. 5D03-377, and the "new evidence" he describes is neither new nor significant, this court issued a show cause order pursuant to State v. Spencer, 751 So.2d 47 (Fla. 1999) (court can restrict future *pro se* pleadings if it first provides a *pro se* litigant notice and an opportunity to respond).

We find no merit in Carlisle's response and hold that his successive petitions constitute an abuse of the judicial system. See, e.g., Harvey v. State, 836 So.2d 1102 (Fla. 5th DCA 2003); Davis v. State, 705 So.2d 133 (Fla. 5th DCA 1998); Isley v. State, 652 So.2d 409, 410-11 (Fla. 5th DCA 1995). Therefore, in accordance with the Criminal Appeal Reform Act of 1996, and in order to conserve judicial resources, we prohibit Carlisle from filing any additional *pro se* appeals, pleadings, motions and petitions relating to his conviction and sentence in his case affirmed by this court in Carlisle v. State, 736 So.2d 1203 (Fla. 5th DCA 1999). Any further pleadings filed in this court relating to his judgment and sentence in that case must be reviewed and signed by an attorney, licenced to practice law in this state. The clerk of the court of the Fifth District Court of Appeal is directed not to accept any further *pro se* filings or pleadings from Carlisle regarding Seventh Judicial Circuit Court No. 97-35355-CFAES [the burglary of a dwelling conviction and sentence].

Carlisle, 849 So.2d at 1146-47 (footnote omitted).

On or about June 9, 2003, Petitioner filed his fourth *pro se* motion for post conviction relief based on newly-discovered

13

evidence, contending that his two trial attorneys were ineffective for failing to adequately prepare for a suppression hearing, and the trial judge erroneously denied the motion to suppress without hearing his wife's testimony. Ex. II. On July 14, 2003, the court denied the Rule 3.850 motion, finding it procedurally barred as successive. Ex. JJ. Petitioner filed a notice of appeal; however, the appellate court did not open a case because it had previously precluded Petitioner from future *pro se* filings. Ex. KK; Ex. LL.

Petitioner's Petition (signed on October 29, 2003, and filed in this Court on October 31, 2003) is timely filed within the one-year period of limitations. See 28 U.S.C. § 2244(d); Response at 14-16.

### III. Evidentiary Hearing

A habeas corpus petitioner is entitled to an evidentiary hearing in federal court if he alleges facts which, if proven, would entitle him to habeas corpus relief. Smith v. Singletary, 170 F.3d 1051, 1053-54 (11th Cir. 1999) (citation omitted); Cave v. Singletary, 971 F.2d 1513, 1516 (11th Cir. 1992) (citing Townsend v. Sain, 372 U.S. 293 (1963)). Here, the pertinent facts of the case are fully developed in the record before the Court. The Court can "adequately assess [Petitioner's] claim[s] without further factual development." Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), cert. denied, 541 U.S. 1034 (2004). Therefore, an evidentiary hearing will not be conducted by this Court.

14

## IV. Standard of Review

On April 24, 1996, the President signed into law the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104-132, 110 Stat. 1214 (hereinafter AEDPA). Since this action was filed after the effective date of AEDPA, the Court will analyze Petitioner's claims under 28 U.S.C. § 2254(d), as amended by AEDPA.

> The Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this [action] and limits our review of the decisions of the state courts:
>
> > A federal court may not grant a petition for a writ of habeas corpus to a state prisoner on any claim that has been adjudicated on the merits in state court unless the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.
>
> Clark v. Crosby, 335 F.3d 1303, 1307-08 (11th Cir. 2003) (citations omitted). . . .

Diaz v. Sec'y for the Dep't of Corr., 402 F.3d 1136, 1141 (11th Cir.), cert. denied, 126 S.Ct. 803 (2005). Furthermore, AEDPA also directs that a presumption of correctness be afforded to factual findings of state courts, which may be rebutted only by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1).

Finally, for a state court's resolution of a claim to be an adjudication on the merits, so that the state court's determination

15

will be entitled to deference for purposes of federal habeas corpus review under AEDPA, all that is required is a rejection of the claim on the merits, not an opinion that explains the state court's rationale for such a ruling. <u>Wright v. Sec'y for the Dep't of Corr.</u>, 278 F.3d 1245, 1255 (11th Cir. 2002), <u>cert</u>. <u>denied</u>, 538 U.S. 906 (2003). Thus, to the extent that Petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under the new § 2254(d).

## V. Ineffective Assistance of Trial Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003) (per curiam) (citations omitted). The Eleventh Circuit captured the essence of an ineffectiveness claim:

> [A] petitioner must show that his lawyer's performance fell below an "objective standard of reasonableness" and that the lawyer's deficient performance prejudiced the petitioner. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Establishing these two elements is not easy: "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." <u>Waters v. Thomas</u>, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc) (quoting <u>Rogers v. Zant</u>, 13 F.3d 384, 386 (11th Cir. 1994)).
>
> For assessing a lawyer's performance, <u>Chandler v. United States</u>, 218 F.3d 1305 (11th Cir. 2000) (en banc) <u>cert</u>. <u>denied</u>, 531 U.S.

1204, 121 S.Ct. 1217, 149 L.Ed.2d 129 (2001), sets out the basic law: "Courts must indulge the strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment." _Id_. at 1314 (internal marks omitted). . . . Our role in reviewing an ineffective assistance claim is not to "grade" a lawyer's performance; instead, we determine only whether a lawyer's performance was within "the wide range of professionally competent assistance." _See Strickland_, 104 S.Ct. at 2066.

The inquiry into whether a lawyer has provided effective assistance is an objective one:  a petitioner must establish that no objectively competent lawyer would have taken the action that his lawyer did take." _See Chandler_, 218 F.3d at 1315. . . .

A petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is also high.  "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding.  Virtually every act or omission of counsel would meet that test."  _Strickland_, 104 S.Ct. at 2067. Instead, a petitioner must establish that a reasonable probability exists that the outcome of the case would have been different if his lawyer had given adequate assistance. _See id_. at 2068.

_Van Poyck v. Florida Dep't of Corrections_, 290 F.3d 1318, 1322-23 (11th Cir. 2002) (per curiam) (footnotes omitted), _cert_. _denied_, 537 U.S. 812 (2002), 537 U.S. 1105 (2003).

In sum, "[w]ithout proof of both deficient performance and prejudice to the defense, . . . it could not be said that the sentence or conviction 'resulted from a breakdown in the adversary process that rendered the result of the proceeding unreliable,' and

17

the sentence or conviction should stand."   Bell v. Cone, 535 U.S.
685, 695 (2002) (internal citation omitted) (quoting Strickland v.
Washington, 466 U.S. 668, 687 (1984)).

## VI. Ineffective Assistance of Appellate Counsel

As noted previously, in Strickland, the United States Supreme
Court articulated a two-pronged test for determining whether a
defendant was denied constitutionally adequate assistance of
counsel. "The same standard applies whether [a court is] examining
the performance of counsel at the trial or appellate level." Eagle
v. Linahan, 279 F.3d 926, 938 (11th Cir. 2001) (citing Matire v.
Wainwright, 811 F.2d 1430, 1435 (11th Cir. 1987)).

To demonstrate that his appellate counsel's performance was
deficient, Petitioner must show that his attorney's performance
"fell below an objective standard of reasonableness." Strickland,
466 U.S. at 687.   "In considering the reasonableness of an
attorney's decision not to raise a particular claim, [a court] must
consider 'all the circumstances, applying a heavy measure of
deference to counsel's judgments.'" Eagle, 279 F.3d at 940
(quoting Strickland, 466 U.S. at 691). "Thus, '[a] fair assessment
of attorney performance requires that every effort be made to
eliminate the distorting effects of hindsight to reconstruct the
circumstances of counsel's challenged conduct, and to evaluate the
conduct from counsel's perspective at that time.'" Id. (quoting
Strickland, 466 U.S. at 689).   The reasonableness of counsel's

assistance is reviewed in light of both the facts and law that existed at the time of the challenged conduct. <u>Chateloin v. Singletary</u>, 89 F.3d 749, 753 (11th Cir. 1996); <u>see also</u> <u>Jones v. United States</u>, 224 F.3d 1251, 1257-58 (11th Cir. 2000) (noting that counsel's "failure to divine" a change in unsettled law did not constitute ineffective assistance of appellate counsel) (quoting <u>Sullivan v. Wainwright</u>, 695 F.2d 1306, 1309 (11th Cir. 1983)).

To determine whether Petitioner was prejudiced by his attorney's failure to raise a particular issue, the Court "must decide whether the arguments the [Petitioner] alleges his counsel failed to raise were significant enough to have affected the outcome of his appeal." <u>United States v. Nyhuis</u>, 211 F.3d 1340, 1344 (11th Cir. 2000) (citing <u>Miller v. Dugger</u>, 858 F.2d 1536, 1538 (11th Cir. 1988)), <u>cert</u>. <u>denied</u>, 531 U.S. 1131 (2001). "If [a court] conclude[s] that the omitted claim would have had a reasonable probability of success, then counsel's performance was necessarily prejudicial because it affected the outcome of the appeal." <u>Eagle</u>, 279 F.3d at 943 (citing <u>Cross v. United States</u>, 893 F.2d 1287, 1290 (11th Cir. 1990)).

## VII. Findings of Fact and Conclusions of Law

### A. Ground One

As ground one, Petitioner Carlisle claims that appellate counsel was ineffective for failure to raise on direct appeal that the trial court erred by failing to conduct a full <u>Nelson</u> inquiry

regarding his February 2, 1998, motion to discharge counsel, for failing to conduct a <u>Faretta</u> hearing regarding his request for self-representation and for refusing to hear his "oral complaints" concerning counsel's incompetency.   This ground was raised in Petitioner's first *pro se* petition for writ of habeas corpus (claims one and two) in the state appellate court.   Ex. P.   The State argued that the claims were without merit, and the appellate court summarily denied the motion without issuing a written opinion.   Ex. Q at 4-6; Ex. R.

Accordingly, this ineffectiveness claim was rejected on the merits by the state appellate court.   Thus, there is a qualifying state court decision.[6]  This claim should be addressed applying the deferential standard for federal court review of state court adjudications, as required by AEDPA.   Upon a thorough review of the record and the applicable law, it is clear that Petitioner is not entitled to relief on the basis of this claim because the state court's adjudication of the claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based

_____

[6] For a state court's resolution of a claim to be an adjudication on the merits, so that the state court's determination will be entitled to deference for purposes of federal habeas corpus review under AEDPA, all that is required is a rejection of the claim on the merits, not an opinion that explains the state court's rationale for such a ruling.   <u>Wright v. Sec'y for the Dep't of Corr.</u>, 278 F.3d at 1255.

on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

The following facts are pertinent to the resolution of this ineffectiveness of appellate counsel claim. On December 8, 1997, Petitioner filed a *pro se* Motion for Dismissal of Counsel; Reappointment of Counsel and Request for <u>Nelson</u> Inquiry, alleging that his counsel differs with his decision to demand a speedy trial. Ex. A at 128-32. In his motion, he stated: "Defendant has made it perfectly clear to his Public Defender he has no desire to proceed *pro se* in this case sub judice, and should not be force[d] to go to trial without counsel." <u>Id</u>. at 129.

On December 12, 1997, the court held a <u>Nelson</u> hearing, at which the court instructed Petitioner Carlisle to articulate his complaints against his counsel, Assistant Public Defender Jane Park. Ex. J at 507, attached Appendix AA, Transcript of Proceedings, <u>Nelson</u> Hearing, at 3. Petitioner first stated, "[i]t was never my intention to proceed *pro se*." <u>Id</u>. He expressed his dissatisfaction with her representation because she had not filed a demand for speedy trial. <u>Id</u>. at 4-6. Ms. Park responded in pertinent part:

> When I file a demand, I'm saying that I'm ready to go to trial within five days. I was not ready to do that.
>
> The State has given me discovery that's very thick. There's nine or ten State witnesses. I haven't spoken to them yet. We

have depos scheduled for -- I think it's the
first week of January.

.    .    .    .

But I haven't spoken to them yet.  I
could not, in good faith, file a demand for
speedy trial knowing I wasn't ready to go to
trial within five days.

Regarding the motion to dismiss, I did
read over his motion.  It looked fairly good
for a lay person, but after consulting with
Mr. Swain from our office -- Mr. Carlisle has
written me 340 pages -- sent me 340 pages of
letters and research since he's been arrested
on this charge, I guess.  We've only been
appointed since November 25th.  He came to
arraignment, so it's been two or three weeks,
I guess.

Since then, I've visited him once.  I've
sent him two letters.  I've spoken on the
phone to him once.  I've tried to keep him
informed of what I'm doing and what's going
on.

I just thought it would be best to do
depos before I started filing motions, not
knowing what the State's witnesses were going
to say.  If they came up with something I
wasn't prepared to defend, that could throw
the whole case completely in the State's
favor.

So I'm just proceeding in the way I best
know how as his attorney and I've been
consulting with Mr. Swain because he's my
supervisor.  He has more experience than I do
and we're trying to keep him happy.

Basically Mr. Swain has told me if we go
to trial he'll sit with me and make sure I
don't do anything -- you know, I mean, just --
just to, you know, make sure that Mr. Carlisle
is happy with what's going on.

Id. at 7-8.  Mr. Scott Swain also stated:

I have been consulting with Ms. Park on the case.

I feel that if we're, as the Public Defender's Office, appointed to represent him, we have an obligation to him as a client to follow the Rules of Professional Responsibility, which is to effectively represent him.

If we can't do that by filing a demand for speedy trial, then I think as long as we represent him it's our duty to effectively represent him and not file the demand.

. . . .

If he wants us to be the lawyer for him, we want to do everything we can to help him. And filing a demand for speedy trial in this case at this time, in my opinion, I would agree with Ms. Park, is not the best thing to help him fight these charges.

Id. at 10.

The trial judge concluded the hearing, stating:

The demand for speedy trial, that complaint, I believe the Public Defender's Office is acting reasonably and responsibly.

As far as experience, she has experience. Also she has the guidance of a very experienced supervisor.

As to the motion to dismiss, she did file it, 1 December. She did file it. It's in the Court file. I find his complaints to be unfounded. His motion to dismiss the P.D., and this is a Nelson hearing, are denied.

Id. at 11.

On or about February 2, 1998, Petitioner Carlisle filed a *pro se* Motion to Discharge Court Appointed Counsel [and] Defendant's

23

Request for Self-Representation, in which he alleged that counsel (Assistant Public Defender Jane Park) had shown an inability to employ a defense as he had directed, that he could not trust her and that he therefore wanted a _Nelson_ hearing to discharge counsel and appoint standby counsel, Mr. Scott Swain.  Ex. A at 171-73; Ex. Q, attached exhibit E.  In the motion, he expressed that "Mr. Swain has a current and up-to-date understanding of his charge and has had numerous talks with Defendant about the complexities of his defense."  Ex. A at 172.

On February 5, 1998, the court conducted a _Nelson_ hearing. Ex. J at 521, attached Appendix BB, Transcript of Proceedings, _Nelson_ Hearing.  The trial judge acknowledged that this was the second _Nelson_ hearing.  _Id_. at 3.  Mr. Swain informed the trial judge that he was willing to take the case over from Ms. Park[7], stating:

> I've talked to Mr. Carlisle several times on
> the phone.  I'm willing to take over and try
> his case.  Take the case over from Ms. Park.
> She's done most of the discovery, but I'm
> familiar with it.  It shouldn't cause any
> delay.  I think Mr. Carlisle will accept me as
> his attorney.

---

[7] At the January 31, 2002, evidentiary hearing, Ms. Park explained that Petitioner Carlisle had sent her 200-300 pages of correspondence and case law and she spoke to Mr. Swain, her supervisor, about the large volume of papers received from Petitioner.  EH Tr. at 6-7, 33.  She stated, "we decided that [Mr. Swain] would take over the case because he had so much more experience, and it would just be better if he just took over the case."  _Id_. at 7.

24

Id.  The trial judge inquired as to whether Petitioner wished to
take that course of action.  Id. at 4.  Petitioner agreed to accept
Mr. Swain's representation of Petitioner.  The trial judge stated:

> Basically, you want a senior PD[8] to take
> over.  I'm allowing you to do it.  You can
> discuss these matters with him.  If he thinks
> it's appropriate, he can file the appropriate
> motions.  We'll do it that way.

Id.  Petitioner expressed satisfaction with the remedy, stating:
"Okay, Your Honor.  That's fine."  Id.

Moreover, with respect to Petitioner's contention that the
trial judge refused to hear his "oral complaints" concerning Ms.
Park's incompetency, this claim is without merit.  The record
reflects that the trial judge had agreed to Mr. Swain's taking over
the case.  Thus, the trial judge stated that he would deny the *pro
se* motions, instructing Petitioner that he had "a senior PD" as his
counsel and therefore Petitioner should consult with him on what
motions should be filed.  Id. at 4-5.  Petitioner agreed to this
course of action.  Thus, there was no need to delve into the
details of Petitioner's complaints about Ms. Park's
ineffectiveness.

"Before a court allows a criminal defendant to proceed *pro se*,
the defendant must clearly and unequivocally assert his right to
self-representation."  Nelson v. Alabama, 292 F.3d 1291, 1295 (11th

---

[8] The trial judge identified Mr. Swain as "one of the division
chiefs upstairs with the PD."  Ex. J at 521, attached Appendix BB,
Transcript of Proceedings, Nelson Hearing, at 3.

Cir. 2002) (citing <u>Faretta v. California</u>, 422 U.S. 806, 835 (1975)), <u>cert</u>. <u>denied</u>, 538 U.S. 926 (2003). The United States Supreme Court has stated:

> When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must 'knowingly and intelligently' forgo those relinquished benefits. <u>Johnson v. Zerbst</u>, 304 U.S., at 464-465, 58 S.Ct., at 1023. <u>Cf</u>. <u>Von Moltke v. Gillies</u>, 332 U.S. 708, 723-724, 68 S.Ct. 316, 323, 92 L.Ed. 309 (plurality opinion of Black, J.). Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' <u>Adams v. United States ex rel. McCann</u>, 317 U.S., at 279, 63 S.Ct., at 242.

<u>Faretta</u>, 422 U.S. at 835.

Here, Petitioner Carlisle filed a *pro se* Motion to Discharge Court Appointed Counsel [and] Defendant's Request for Self-Representation, in which he expressed his dissatisfaction with Ms. Park, requested the court to allow him to proceed *pro se* and further specifically requested the appointment of Mr. Swain of the Public Defender's Office, as standby counsel. However, as reflected at the February 5, 1998, hearing, Petitioner agreed to the appointment of Mr. Swain as his counsel and further agreed that he would consult with Mr. Swain on what motions should be filed.

After the jury trial, a third <u>Nelson</u> hearing was conducted on May 7, 1998, at which the trial judge heard Petitioner's complaints about Mr. Swain.   Mr. Swain affirmed that there was nothing that had interfered with his ability to represent Petitioner and that he would continue to do the best job for Petitioner.   Ex. A, Transcript of the May 7, 1998, Sentencing Hearing, at 10.   The trial judge concluded:

> I note for the record that there were two prior <u>Nelson</u> hearings and when I finally got Mr. Swain, who is a senior public defender trial attorney, to represent Mr. Carlisle, Mr. Carlisle said, [f]orget the other things in the past; that he was now satisfied and he'd go with Mr. Swain.
>
> We went through the trial.   I personally observed Mr. Swain represent you, sir, and I think he did a very commendable job.
>
> And when the jury went out -- and I had somebody go back into the record and check it this week -- when the jury went out, I asked you to stand, and you stood, and I said, "Sir, are you satisfied with Mr. Swain as your attorney?"   And you know what?   You said, "I sure am, Judge."
>
> So I don't know what's happened between now and then, but as far as I'm concerned, you've had competent representation and you told me as much.
>
> Your <u>Nelson</u> hearing claims are denied, sir.

<u>Id</u>. at 10-11.

It is noteworthy that Petitioner Carlisle raised the substance of these claims when he addressed ground seven (ineffective

assistance of trial counsel for interfering with the trial court's handling of his *pro se* motion to discharge them as counsel and thus depriving him of <u>Nelson</u> and <u>Faretta</u> hearings) in his first Rule 3.850 motion.  In denying ground seven, the trial court stated in pertinent part:

> [T]wo *Nelson* hearings were held on December 12, 1997[,] and February 5, 1998[,] on Defendant's numerous *pro se* motions to discharge where the Court heard testimony from (1) Defendant who alleged that he had a conflict of interest with his counsel, Jane Park, due to "unkept" promises, <u>i.e.</u> that he was misled that his counsel would file a demand for speedy trial and his motion to dismiss and (2) Attorney Park who informed the Court about the numerous letters and research that Defendant had sent to her office and her attempts to keep Defendant informed, which was the subject of the motion to withdraw. Defendant's motions to discharge were subsequently denied on both occasions. . . .
>
> Furthermore, a review of Defendant's *pro se* motions to discharge his trial counsel reveals that Defendant did state in one of his motions to discharge that he wanted to proceed *pro se* in his case.[9]  However, he further requested that this Court appoint Scott Swain as "standby counsel."  At the February 5, 1998[,] *Nelson* hearing, this Court denied his motion but allowed Scott Swain to be appointed as Defendant's attorney.  Defendant agreed to this appointment.  Therefore, this Court cannot find that Defendant was prejudiced because a full *Nelson* and *Faretta* [i]nquiry was not conducted when he agreed to be represented by senior public defender and division chief, Attorney Scott Swain.

---

[9] Ex. A at 171-73, Motion to Discharge Court Appointed Counsel [and] Defendant's Request for Self-Representation.

Ex. J at 371-72 (footnotes omitted).  On appeal, the appellate court per curiam affirmed without issuing a written opinion. <u>Carlisle</u>, 829 So.2d 232; Ex. N.

Petitioner's appellate counsel cannot be faulted for failing to raise this ground on direct appeal since the record reflects that the trial court did not err.  Even assuming *arguendo* deficient performance by appellate counsel, Petitioner has not shown prejudice.  As previously noted, Petitioner presented this ineffectiveness claim (appellate counsel's failure to raise the trial court's error on direct appeal) to the appellate court (Ex. P, grounds one and two), and the appellate court denied the petition.  Ex. R.  Petitioner was not prejudiced when this ground was not included on direct appeal since the omitted claim would not have had a reasonable probability of success before the appellate court.  This ineffectiveness of appellate counsel claim is without merit.

### B. Grounds Two and Three

As ground two, Petitioner claims trial counsel was ineffective (a) for waiving Petitioner's right to testify at trial without Petitioner's concurrence and without explicitly advising Petitioner that the ultimate decision was Petitioner's, not counsel's, and (b) for dissuading Petitioner from testifying by misadvising him that the State would inform the jury that he was a convicted burglar and

would impeach him if he testified.  As ground three, Petitioner
contends that the trial court impermissibly infringed upon and
substantially interfered with his right to testify by "presenting
him with five (5) ultimatums[10] to testify as his own first
witness" and interfering with his presentation of witnesses.
Respondents acknowledge that Petitioner raised these claims in his
first Rule 3.850 motion and on appeal of the Rule 3.850 motion.
Response at 17.  The trial court adjudicated these claims on the
merits.  In denying these claims, the trial court identified the
two-prong Strickland ineffectiveness test as the controlling law
and stated in pertinent part:

> In Ground One, Defendant alleges that he
> was denied effective assistance of counsel
> because trial counsel did not allow him to
> testify on his own behalf although he
> expressly stated that he desired to do so and
> the trial judge substantially interfered and
> influenced Defendant to yield to his trial
> counsel's advice not to testify.  In support
> of his Ground One claim, Defendant alleges
> that due to the following omissions, he was
> denied effective assistance of counsel based
> on the instant claim.
>
> **Omission A**
> First, Defendant alleges that he repeatedly
> told his trial counsel that he wanted to
> testify and he went to trial with the
> assurance from his trial counsel that he would
> testify.  Further, Defendant claims that his
> trial counsel told him that if he testified,
> he would reveal his past record to the jury.
> Defendant states that he was still willing to

_____

[10] See Petitioner's Memorandum of Law (Doc. #13) at 13-15
(setting forth the trial judge's five "ultimatums").

testify because his trial counsel told him
that the only real evidence of his innocence
was through his own testimony.  Thus, he would
have testified in order to explain to the jury
the key missing element of the burglary, *i.e.*,
his pawning of allegedly stolen property and
his statements to Jean Heir.  However,
Defendant claims that, without any warning,
his trial counsel stated that Defendant would
not testify although Defendant never informed
his trial counsel that he had changed his
mind.  Moreover, Defendant asserts that the
record supports his contention that the choice
not to testify was based on counsel's decision
and not his own "free and independent choice."
Thus, Defendant avers that his trial counsel
was ineffective because he waived Defendant's
right to testify <u>before</u> knowing whether [the]
defense['s] five witnesses would arrive in
court since his trial counsel had never spoken
to any of the witnesses personally and only
did so minutes after their arrival in court
and thus he could not have assessed the
"actual worth of their testimony."

**Omission B**
In addition, Defendant claims that he was
confused when the trial judge "substantially
interfered with his ability to make an
independent decision, intelligently,
intentionally and knowingly based" when the
trial judge emphasized that he did not know if
his testimony was in his best interest but if
he wanted to testify, then this was his
chance.  Further, Defendant states that the
trial judge created a "tense, hurried moment"
by instructing Defendant to testify as the
first defense witness, and this pressure
substantially influenced him to either testify
without the benefit of the testimony of his
other four (4) witnesses who later arrived
after the trial judge had accepted Defendant's
"coerced" waiver to testify or to "yield" to
counsel's advice not to testify.  Thus, he had
"no other choice" but to follow his counsel's
advice since the trial judge did not make any
generally accepted procedural safeguards on-
the-record to make certain that Defendant

31

> understood the consequences of his waiver nor did the trial judge provide any meaningful opportunity for Defendant to confer with counsel about the waiver.
>
> . . . .
>
> After reviewing Defendant's entire Ground One claim, the Court finds that he has not shown "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Torres-Arboleda v. Dugger</u>, 636 So.2d 1321 (Fla. 1994). Specifically, the Court initially finds that a review of the trial transcripts demonstrates that Defendant knowingly and voluntarily waived his right to testify, contrary to his assertions in Omissions A and B. The trial transcripts reveal that the trial judge unequivocally advised Defendant that he had the right to testify if he wished and that ultimate decision belonged to him, not his lawyer. At that point, Defendant directly stated on the record that he would follow his lawyer's advice and not testify. [Transcript of the Jury Trial Proceedings at 465-66]. <u>See</u> <u>Jones v. Barnes</u>, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) ("It is also recognized that the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal. . . .").

Ex. J at 355-56, 359 (footnote omitted).

As noted previously, upon Petitioner's appeal, the appellate court per curiam affirmed the trial court's order. Accordingly, the claims were rejected on the merits by the state trial and appellate courts. Thus, there are qualifying state court decisions. These grounds should be addressed applying the deferential standard for federal court review of state court

32

adjudications, as required by AEDPA.  Upon a thorough review of the record and the applicable law, it is clear that Petitioner is not entitled to relief on the basis of these claims because the state courts' adjudications of these claims were not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

This Court also finds these claims to be without merit.  The trial transcript reflects that defense counsel informed the trial judge that four defense witnesses were not yet present in the courtroom to testify.  See Ex. B., Transcript of the Jury Trial Proceedings (hereinafter Tr.) at 460.  The trial judge then notified the defense that it needed to make a decision on whether Petitioner would testify and stated:  "If he's going to testify, why can't we put him on and use the others?  If we've got somebody we can put on, why delay it?"  Id. at 460-61 (the trial judge's first ultimatum, as alleged by Petitioner).  After discussing jury instruction issues, the trial judge inquired as to whether Petitioner Carlisle would testify on his own behalf.  Id. at 464-65 (the trial judge's second and third ultimatums, as alleged by Petitioner).  Mr. Swain reported to the trial judge:  "Mr. Carlisle is not going to testify in this cause, Your Honor."  Id. at 465.

The trial judge then informed Petitioner Carlisle of his right to testify and that it was his decision to make.

> Mr. Carlisle, you've got a right to testify. I don't know whether it's in your best interest or not. You're represented by a good attorney. Talk to him. Make your decision.
>
> Frankly, I don't know whether the other witnesses are going to come or not. We told the jury 8:30. It's already almost nine o'clock. If you want to testify, you can. This is your chance.

Id. (the trial judge's fourth ultimatum, as alleged by Petitioner). Mr. Swain noted: "I don't mind putting on the record he's following my advice." Id. The trial judge again notified Petitioner that it was Petitioner's decision, not counsel's decision.

> You know, it's up to him. He makes the ultimate decision. I just want him to know he's got that chance. If he wants to testify, he can do it. But we need to get rolling.

Id. (the trial judge's fifth ultimatum, as alleged by Petitioner). Petitioner Carlisle responded: "Judge, I'm going to follow my attorney's advice." Id. at 466. The trial judge concluded that Petitioner had waived his right to testify. Id. The trial judge then asked defense counsel if he would prefer a recess to allow more time for the four defense witnesses to arrive. Id. After a recess, the four witnesses testified.

Petitioner's contention that his decision not to testify was based on Mr. Swain's misadvice (by misadvising him that the State would inform the jury that he was a convicted burglar and would

impeach him if he testified) is without merit. <u>See</u> Ex. A,
Transcript of the May 7, 1998, Sentencing Hearing, at 99-100, 115
(setting forth Petitioner's prior felony convictions as the basis
for the trial judge's finding him to be an habitual felony
offender).   Further, at the sentencing hearing, the trial judge
commented on his lengthy prior criminal record.

>Sir, you have a terrible record.  It's
>one of the longer records and more significant
>records that I have seen.  It starts at an
>early age and continues through now.
>
>I also observed you trying to manipulate
>the system.  I think it's one of the worst
>cases of manipulation by a defendant I've
>seen.  I've never held three <u>Nelson</u> hearings
>before.
>
>I know when you told me that you were
>satisfied having your attorney, Mr. Swain,
>represent you through trial that you meant
>it.[11]   As soon as you got convicted, you
>started criticizing Mr. Swain and the
>criticism of the PD kept up through the whole
>proceedings.
>
>It looks like to me, also, too, that you
>tried to create appellate error during the
>course of the trial.
>
>. . . .
>
>Also, I can't help but note that it's a
>burglary of your mother's house and your
>sister's house.  I mean, how low can you go?
>
>It is necessary for me to sentence you as
>an habitual.  The habitual sentencing was
>designed for people like you.

---

[11] <u>See</u> Tr. at 555.

> You are hereby sentenced to twenty-five
> years in the Florida State Prison system, with
> credit for time served, as an habitual
> offender.

Id. at 115-16; Ex. A at 292-96, Judgment; Ex. A at 459-60, Court

Findings Supporting Habitual Felony Offender Status, filed May 11,

1998.  Finally, at the evidentiary hearing, Ms. Park testified that

Petitioner did not want to testify because of his felony

convictions and because he did not think the State had enough

evidence to convict him.   EH Tr. at 36.

In evaluating the performance prong of the Strickland

ineffectiveness inquiry, there is a strong presumption in favor of

competence.   The presumption that Mr. Swain's performance was

reasonable is even stronger since the record reflects that he is an

experienced criminal defense attorney.[12]   The inquiry is "whether,

---

[12] "When courts are examining the performance of an experienced
trial counsel, the presumption that his conduct was reasonable is
even stronger."   Chandler v. United States, 218 F.3d 1305, 1316
(11th Cir. 2000) (en banc), cert. denied, 531 U.S. 1204 (2001).  At
the January 31, 2002, evidentiary hearing, Mr. Swain testified that
he had been an Assistant Public Defender since 1983 and was the
chief of the trial division.  EH Tr. at 46.  Additionally, Ms. Park
testified that Mr. Swain, her supervisor, took over the case
"because he had so much more experience . . . ."  Id. at 7.
Further, before Petitioner's trial, the trial judge identified Mr.
Swain as "one of the division chiefs" with the Public Defender's
Office.   Ex. J at 521, attached Appendix BB, Transcript of
Proceedings, Nelson Hearing, at 3; see Williams v. Head, 185 F.3d
1223, 1229 (11th Cir. 1999) (noting that "[i]t matters to our
analysis" whether the attorney is an experienced criminal defense
attorney), cert. denied, 530 U.S. 1246 (2000).   And, finally, at
the sentencing hearing, the trial judge commented that he had
observed Mr. Swain's performance during the trial proceedings and
noted "he did a very commendable job."   Ex. A, Transcript of the
May 7, 1998, Sentencing Hearing, at 11.

in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. "[H]indsight is discounted by pegging adequacy to 'counsel's perspective at the time' . . . and by giving a 'heavy measure of deference to counsel's judgments.'" Rompilla v. Beard, 545 U.S. 374, 381 (2005) (citations omitted). Thus, Petitioner must establish that no competent attorney would have taken the action that counsel, here, chose. United States v. Freixas, 332 F.3d 1314, 1319-20 (11th Cir. 2003). Given defense counsel's actions based on the record before this Court, defense counsel's performance was not deficient.

Even assuming *arguendo* deficient performance by defense counsel, Petitioner has not shown prejudice. Petitioner has not shown that a reasonable probability exists that the outcome of the case would have been different if his lawyer had given the assistance that Petitioner has alleged he should have provided Thus, the ineffectiveness claim is without merit.

And, finally, the record clearly reflects that the trial judge did not interfere with Petitioner's decision of whether or not to testify. While waiting for Petitioner's witnesses who were late in arriving, the trial judge addressed other matters and merely inquired as to whether Petitioner Carlisle would be testifying. After the trial judge informed Petitioner that it was ultimately his decision, not counsel's decision, Petitioner notified the trial

37

judge that he would follow his attorney's advice and not testify. Petitioner did not request more time to think about his decision. The record clearly reflects Petitioner's firm decision <u>not</u> to testify.  Therefore, for the above-stated reasons, grounds two and three are without merit.

### C. Ground Four

Petitioner Carlisle claims that he was denied the right to a fair trial, the right to present an alibi witness, and the right to effective assistance of counsel due to counsels' failure to investigate, interview, depose and properly subpoena Renee Carlisle.  Petitioner alleges that newly discovered evidence (from Ms. Park's case file[13], which was found by the attorney appointed to represent him at the evidentiary hearing) and trial counsels' testimony at the evidentiary hearing show that both of Petitioner's trial attorneys were ineffective.  In his supporting Memorandum of Law (Doc. #13), he has separated ground four into two sub-claims that he refers to as omissions A and B.   As omission A, he specifically states that Mr. Swain "misled the trial judge when asked was Renee Carlisle - Petitioner's wife - subpoenaed by the defense."   Petitioner's Memorandum of Law at 17; Petition at 13; Tr. 490-91.   Specifically, Petitioner states that Mr. Swain told

---

[13] <u>See</u> App. K, Ms. Park's file copy of the unexecuted subpoena for Renee Carlisle; App. L, Ms. Park's Witness List; App. M, Ms. Park's secretary's January 14, 1998, letter to Sheriff Kevin Beary regarding service of the subpoena upon Renee Carlisle.

the trial judge that Renee Carlisle had not been subpoenaed when in fact Ms. Park had subpoenaed her.  As omission B, Petitioner claims that Ms. Park knew that Renee Carlisle was undergoing substance abuse treatment at the Bridge in Gainesville, but failed "to exercise reasonable care to ensure that her secretary (Cindy)[,] when sending Renee Carlisle's subpoena[,] addressed the subpoena to the Bridge in Gainesville."  Petitioner's Memorandum of Law at 19; Petition at 12-13.

As noted by Petitioner (Petition at 14; Petitioner's Second Amended Reply to State's Response (Doc. #47) at 2), he raised these ineffectiveness claims in his third Rule 3.850 motion for post conviction relief.  See Ex. S, Petitioner's Third Rule 3.850. Respondents contend, and this Court agrees, that ground 4(b) (concerning Ms. Park's alleged ineffectiveness) is procedurally barred.  Response at 17-18, 26; Second Response at 3-7.  In denying the Rule 3.850 motion with respect to ground 4(b), the trial court concluded that the claim was procedurally barred, stating:

> The defendant also claims that he told his initial trial counsel [Ms. Park] where his wife could be reached.  This claim is barred because it could have been raised in his first timely postconviction motion.  Mitchell v. State, 2002 WL 1301513 (Fla. 5th DCA 2002). The same holds true of his claim that counsel did not interview his wife.  Id.  While counsel may have testified relatively recently that she had not spoken with Mrs. Carlisle [EH Tr. at 42-43 (Ms. Park's testimony at the evidentiary hearing on January 31, 2002)], there is no reason the claim could not have been raised in the defendant['s] initial,

39

>           timely    rule    3.850    motion.      This    is
>           particularly  so  since  defendant  purportedly
>           believed  that  she  had  not  been  served  a
>           subpoena.   Whether or not she was subpoenaed,
>           she was not at the trial.

Ex. V at 10-11.[14]

>           A  state  habeas  corpus  petitioner  who
>           fails to raise his federal claims properly in
>           state    court    is    procedurally    barred    from
>           pursuing    the    same    claim    in    federal
>           court    absent    a    showing    of    cause    for    and    actual
>           prejudice  from  the  default.   <u>Wainwright  v.
>           Sykes</u>,  433  U.S.  72,  87,  97  S.Ct.  2497,  53
>           L.Ed.2d  594  (1977)  .  .  .  .  [W]here  the  state
>           court  correctly  applies  a  procedural  default
>           principle    of    state    law    to    arrive    at    the
>           conclusion    that    the    petitioner's    federal
>           claims are barred, <u>Sykes</u> requires the federal
>           court  to  respect  the  state  court's  decision.
>           <u>Atkins v. Singletary</u>, 965 F.2d 952, 956 (11th
>           Cir.  1992),  <u>cert</u>.  <u>denied</u>,  515  U.S.  1165,  115
>           S.Ct.  2624,  132  L.Ed.2d  865  (1995);  <u>Meagher v.
>           Dugger</u>,  861  F.2d  1242,  1245  (11th  Cir.  1988).

<u>Bailey v. Nagle</u>, 172 F.3d 1299, 1303 (11th Cir. 1999) (per curiam).

---

[14] Petitioner Carlisle first raised Ms. Park's ineffectiveness (for failure to properly serve a subpoena upon Renee Carlise) in his second *pro se* Rule 3.850 motion.  Ex. J at 624-52.  However, the trial court entered an order striking the *pro se* Rule 3.850 motion since Petitioner was represented by counsel, who was preparing for an evidentiary hearing on his first Rule 3.850 motion.  <u>Id</u>. at 669; <u>see</u> <u>also</u> Ex. J, Order Striking Defendant's Correspondence Reviewed as a Motion for Rehearing on Grounds One, Two, Four, Five, Six, Seven, Eight and Nine of Motion for Post Conviction Relief, at 660 (stating "since the correspondence does not indicate that his counsel endorses the instant motion, the Court cannot consider the *pro se* request" and striking the motion "as well as any future *pro se* pleadings filed by Defendant while he is represented by counsel.").   The trial court stated that Petitioner's counsel may file, if appropriate, an amended Rule 3.850 motion to include the newly discovered evidence.   Ex. J at 669.   However, counsel did not amend Petitioner's Rule 3.850 motion.  Supp. Ex. E.

Here, the trial court properly found that this claim was untimely and procedurally barred.  The appellate court affirmed the trial court's order, and rehearing was denied.  Thus, this claim has been procedurally defaulted.

"Procedural defaults in state courts will foreclose federal court review, absent a showing of cause and prejudice." <u>Parker v. Sec'y for the Dep't of Corr.</u>, 331 F.3d 764, 770 (11th Cir. 2003) (citing <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977)), <u>cert</u>. <u>denied</u>, 540 U.S. 1222 (2004).  "[A] federal court may also grant a habeas petition on a procedurally defaulted claim, without a showing of cause or prejudice, to correct a fundamental miscarriage of justice."  <u>Fortenberry v. Haley</u>, 297 F.3d 1213, 1222 (11th Cir. 2002) (per curiam) (citing <u>Murray v. Carrier</u>, 477 U.S. 478, 495-96 (1986)), <u>cert</u>. <u>denied</u>, 538 U.S. 947 (2003).  "In order to show the type of 'miscarriage of justice' that will excuse a procedural bar, a petitioner must make a colorable showing of actual innocence." <u>Crawford v. Head</u>, 311 F.3d 1288, 1327 (11th Cir. 2002) (citations omitted), <u>cert</u>. <u>denied</u>, 540 U.S. 956 (2003).  The actual innocence exception is "exceedingly narrow in scope" and requires proof of factual innocence, not mere legal insufficiency.  <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir. 2001) (citations omitted), <u>cert</u>. <u>denied</u>, 535 U.S. 926 (2002); <u>Sawyer v. Holder</u>, 326 F.3d 1363, 1367 (11th Cir.), <u>cert</u>. <u>denied</u>, 540 U.S. 900 (2003).  "To meet this standard, a petitioner must 'show that it is more likely than not

41

that no reasonable juror would have convicted him' of the underlying offense." Johnson, 256 F.3d at 1171 (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)).    Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." Id. (citation omitted) (quoting Schlup, 513 U.S. at 324) (explaining that "[g]iven the rarity of such evidence, in virtually every case, the allegation of actual innocence has been summarily rejected.").

Here, Petitioner has not shown both cause[15] excusing the default and actual prejudice[16] resulting from the bar.    Furthermore, he has not shown that he is entitled to the fundamental miscarriage of justice exception.[17]

---

[15] The actions of post-conviction counsel cannot establish cause for a procedural default. Coleman v. Thompson, 501 U.S. 722, 752-53 (1991); Whiddon v. Dugger, 894 F.2d 1266, 1267 (11th Cir.), cert. denied, 498 U.S. 834 (1990).

[16] See Second Response at 7, 17.

[17] Petitioner cites to Renee Carlisle's affidavit and answers to written interrogatories and Robert Carlisle, Jr.'s affidavit to support his contention that he is "factually innocent." Petitioner's Second Amended Reply to State's Response (Doc. #47) at 2; Petitioner's Motion to Expand (Doc. #58), App. SS1D, "Unnotarized Oath, Deposition and Written Interrogatories of Renee M. Carlisle, Declaration," dated January 18, 2006; Petitioner's Motion to Expand (Doc. #44), App. SS, Renee Carlisle's affidavit (stating she "was with James Croney when he broke into the apartment" belonging to Claire Storm and Leslie Parent; noting that she did not appear in court to testify for Petitioner because she was threatened by Leslie Parent and Jean Hiers not to testify and because she did not receive a subpoena from Petitioner's counsel; and, concluding Petitioner "was wrongly convicted"), dated August 15, 2005; App. S, Robert Carlisle Jr.'s affidavit (stating that Renee Carlisle (his mother) had told him shortly after being

Even assuming *arguendo* that ground 4(b) is not procedurally barred, both grounds 4(a) and 4(b) should be addressed applying the deferential standard for federal court review of state court adjudications, as required by AEDPA.  The trial court adjudicated both grounds on the merits.  In denying these claims, the trial court identified the two-prong <u>Strickland</u> ineffectiveness test as the controlling law and stated in pertinent part:

> **Ground One - Omission A:  The defendant contends that his counsel [Mr. Swain] lied to the Court when he advised that the defendant's wife was not under subpoena by his office.** He argues further that this purported misrepresentation, which he conjectures was made to obtain exculpatory hearsay of his wife through his young son, prejudiced him because the son misspoke while on the witness stand. "[The defendant]'s claim is wholly conclusory,

---

arrested that she had burglarized Leslie's apartment and would not let his father go to prison for something she did; however, due to the influence and manipulation of his mother and Jean Hiers, he did not testify truthfully at the trial because his mother begged him not to testify about her admitting to the burglary), dated December 10, 2001.  However, as recognized by the trial court in denying his third *pro se* Rule 3.850 motion, the evidence at trial (including Petitioner's admissions to Ms. Hiers, his statements to Officer Thompson "to the effect that Mrs. Carlisle had put him up to committing the burglary to the residence" (Tr. at 354-55), his flight from the police the next day and other strong circumstantial evidence) was substantial.  Petitioner has not shown that it is more likely than not that no reasonable juror, hearing all the testimony, would have convicted him of the underlying offense.  <u>See also</u> Second Response at 7 (noting the "extensive evidence" at trial).  Further, the jury did hear Cody Carlisle's testimony that his mother, Renee Carlisle, had told him that she would not go to jail for something she did.  Tr. at 493, 496-97.  Finally, Ms. Carlisle's credibility would have been attacked at the trial by the prosecution, specifically concerning her statement to Jean Hiers and Leslie Parent that she would open Petitioner's van because she did not have anything to hide.  <u>Id</u>. at 287, 382.

amounting to little more than speculation..."
*Gorby v. State,* 2002 WL 534413 (Fla. 2002).

The defendant insists that his wife had
been served based primarily upon copies of a
subpoena for his wife, the defense witness
list, and a letter to the Orange County
Sheriff['ls Office (Def.- E, F, and I).  Among
the problems with the defendant's position is
that it is conclusory.  Additionally, his
claim that his wife was served the subpoena is
not established because the subpoena was not
executed by the clerk (Def-E).  Further, at
the trial[,] counsel for both parties
indicated some confusion.  Defense counsel was
uncertain of her whereabouts and the
prosecutor believed that the defendant's wife
was at the Bridge in Ocala (App-491-492).  By
the defendant's own admission, the address on
the subpoena for his wife was inaccurate
(MPCR-15)[18] [Defendant's Motion for Post
Conviction Relief; Ex. S].  As a result, she
could not have been served the subpoena.  **The
record evidence is clear that trial counsel
made no misrepresentation to this Court.**

.   .   .   .

The defendant bases his claim of
prejudice in large part upon the testimony of
his son.  On proffer[,] the boy first
testified that his mother had told him: "That
she would go to jail for something my dad
did." (App-488).  After indicating that he
misspoke, he then testified that she had said:
"She would not go to jail for something she
did." (App-489).  The state impeached the boy
with his proffered testimony and the defense
rehabilitated him (App-496-498). The defendant
also claims testimony by his wife would have
impacted upon the verdict.  That is unlikely
because he blamed her for the burglary (App-

---

[18] Petitioner states that Ms. Park should have served the
subpoena upon Renee Carlisle at the Bridge in Gainesville, not the
Bridge in Orlando.  Ex. S at 15; App. K, Ms. Park's Unexecuted
subpoena for Renee Carlisle.

298) and, as detailed *ante,* **she could not be served because her whereabouts were unknown.** In any event, not only are the defendant's claims conclusory, but they are inadequate to establish the necessary prejudice to grant relief. **The evidence was such that it is not probable that an acquittal would be returned on retrial.** *Davis* v. *State,* 736 So.2d 1156, 1158-1159 (Fla. 1999).

The defendant's mother, Claire Storm, and his half-sister, Leslie Parent, shared an apartment (App-269-270; 425). The defendant was at their apartment on Memorial Day weekend in 1997 (App-270; 425). His wife, Renee Carlisle, had never been to the apartment (App-284).

The defendant and his wife had stayed with Ms. Jean Heirs until she made them leave a couple of weeks before August 8, 1997 (App-368-369; 373). The defendant called the next day and said that he and his wife were in Ocala looking for work (App-374).

The defendant's mother left her apartment at 7:00 a.m. on August 7, 1997 (App-271; 426). The apartment was in disarray upon Leslie's return at 9:00 a.m. (App-272). Much of her property, including clothes, shoes, jewelry, a boom box with compact discs and a nail kit had been stolen (App-273-274). It was determined that entry had been made through a window from which the latch had been broken (App-277; 415). The defendant's mother had observed him at the window when he visited her. She saw him raising his arms and asked what he was doing. He told her that he was looking at a van (App-425-426).

The defendant's sister concluded that he had committed the burglary because her nail kit had been stolen and the defendant's wife was also a nail technician (App-278).

The defendant and his wife went to Ms. Heirs home on the evening of August 7, 1997 (App-375). He told Ms. Heirs that he and his

wife were coming back to Jacksonville because his wife could go to work as he had just obtained a nail kit for her (App-377; 278). Ms. Heirs thought it was odd that he could afford a nail kit yet had to have paychecks for his wife and him to live. *Id.*

The defendant's sister called Jean Heirs in Jacksonville (App-278). When the victim told Ms. Heirs about what was stolen, Ms. Heirs commented upon the irony of the defendant telling her that he had just obtained a nail kit for his wife (App-378).

The defendant and his wife arrived at Ms. Heirs['] home around 10:30 a.m. on August 8, 1997, and showered (App-380).

The defendant's sister later arrived at Ms. Heirs['] house with a deputy (App-282-283). The defendant's wife came out of the house wearing the sister's clothing, shoes and jewelry, as well as the mother's jewelry (App-283; 337). The defendant was not in the house (App-286; 340; 349; 382; 413), although he was present before the police arrived (App-412). The police conducted a K-9 search (App-382).

The sister saw her boom box and CDs inside of the van (App-286; 339). The defendant's wife said she would open the van as she had nothing to hide (App-287; 382). Most of the victim's property was recovered from the van (App-288; 341).

As the van began to pull out[,] the defendant tiptoed as he ran across the street to jump in the passenger side of the van (App-384; 349). Ms. Hiers yelled (App-349[]). The police pursued the van with lights and siren activated (App-350-351). The van ran a stop sign at the intersection with a six-lane roadway (App-351-352). The van stopped after three blocks and the defendant got out and ran (App-352; 362). The defendant stopped running only after injuring himself when he scaled a six-foot chain link fence (App-353). After his arrest[,] the defendant told the police that

46

his wife had put him up to committing the burglary (App-354-355).

The defendant called his sister the next day (App-298). She testified as follows regarding the call:

I answered the phone. I actually accepted the collect call. "Leslie, I'm sorry. I'm sorry. Forgive me. I didn't mean to do it."

I said, "Bob, how could you do this to me?"

"I'm sorry. I'm sorry. Renee did it." I said, "Renee didn't do this, Bob.   You did this to me."

"No, Renee -"

"Renee didn't do that. If you say that to me one more time, I'm hanging up on you and I'm never speaking to you again. Where is my jewelry?   Where is it?   I didn't find everything. Where is my property?"

He said, "Leslie, I'm sorry. Please forgive me. I'll pay restitution."

I said, "Bob, tell me where my jewelry is."

"Well, some of it is in a pawn shop in Ocala. I can't tell you where now, but if you get me out of here, I can show you," and I hung up the phone on him.

(App-298-299).

The defendant also called his mother, who testified:

And Bob got on the phone, "Mom, please, please. Mom, I'm sorry. Please, Mom, I'm sorry."

And I said to him, "Where is my jewelry? Where?"

47

"Mom, I'm sorry," and I slammed the receiver down. I didn't want to hear anymore.

(App-426-427).

The defendant also called Ms. Hiers many times after his arrest. She testified in pertinent part as follows:

A    We've talked about what happened. He told me about being across the street and laying, you know, behind the house with some shrubbery or something over him watching what was going on. He wanted to know what some of the conversation was because he could not hear over there what was happening, and we discussed that. We've talked about his mother's house, and he told me that if he was convicted that they would H.O.

. . . .

A    He did tell me about - and he - first he says, "No, I did not do it, Jean."

I said, "Bob, wait a minute. I know you. You know I do." I said, "Cut the bull and let's just talk." I said, "When you went to your mom's house, did somebody have a gun in your back and make you do this?"

Bob says, "Well, no." Did Renee have a gun in your back to make you do this?"

"Well, no."

I said, "Well, let's just face facts here. If Renee did not know how to get to your mother's house, then you had to have done it."

He said, "I know. I didn't mean to do it. I was all messed up on drugs."

. . . .

Q    (By [prosecutor]):  Ms. Hiers, did he make any - did you have any conversation about that specific admission that "I got

48

Renee a nail kit?" Did you have any
conversations regarding that statement from
Mr. Carlisle?

A    Many conversations about that.  He
said, "Jean, that's not what I said."  He
said, "I remember specifically what I said. I
told you that Renee got the nail kit."

I said, "Bob, that's not true. That's not
what you said to me."

He says, "Yes, it is." He says, "It means
my life that Renee got that nail kit."

Q    Did he make any specific admissions
other than the nail kit what he took from
Leslie and Claire's house in Daytona, any
other items?

A    There's a gold cross and a nugget.
There's a third item, but I can't remember
what the third item was. I can't remember what
the third item was that was taken.

Q    But basically he admitted to the
nail kit, the gold nugget and the cross?

A    Yes, sir.

Q    Taken from Leslie and Renee's (sic)
house?

A    Yes, sir.  Leslie's house.

Q    And did he admit to you pawning any
of the items taken from Leslie and Claire's
house?

A    Yes, sir. He also said that he was
going to call Leslie and see if he could cut a
deal with her, that he promised that he would
pay her back restitution or whatever he could
do so that she wouldn't put him in jail.

(App-385-390).

49

A week or two after the burglary the defendant's sister recovered more items from the van (App-295).  She found two sets of scissors and a pawn slip (App-296).  Her mother found some credit cards inside a popcorn bag.  *Id*.  The sister also recovered property in pawnshops in different parts of the state, including one in Ocala as he had told her when the defendant called after his arrest (App-299-301).

**Contrary to the argument of the defendant, the evidence is not merely "she said . . . he said." In addition to the admissions to Ms. Heirs and strong circumstantial evidence, there is, for example, the evidence of flight.**  "The law is well settled that evidence of flight is admissible as being relevant to infer consciousness of guilt where sufficient evidence exists to establish that the defendant fled to avoid prosecution of the charged offense." *Shellito v. State,* 701 So.2d 837, 840 (Fla. 1997).  Further: "The rule is that, when a suspected person in any manner endeavors to escape, or evade a threatened prosecution, by flight, concealment, resistance to a lawful arrest, or other *ex post facto* indication of a desire to evade prosecution, such fact may be shown in evidence as one of a series of circumstances from which guilt may be inferred." *State v. St. Jean,* 658 So.2d 1056 (Fla. 5th DCA 1995). The defendant tried to evade prosecution by taking flight after surreptitiously hiding from the police. **Moreover, it was not merely the word of Ms. Hiers that convicted the defendant.  In addition to evidence mentioned immediately above, he made admissions or confessions to his mother and sister as well.** "[T]he nature of an admission or confession ... would tend to establish appellant's guilt of the crime charged." *Russell v. State,* 614 So.2d 605, 609 (Fla. 1st DCA 1993); *see also Burks v. State,* 589 So.2d 355, 357 (Fla. 5th DCA 1991) (confession is [a] statement

acknowledging guilt that is not susceptible of reasonable contrary inference).

. . . .

In any event, the claim lacks merit because **the record establishes that she [Renee Carlisle] was unavailable for trial because her whereabouts were unknown.** Also, for the same reasons discussed at length regarding the other aspects of this ground, prejudice has not been established. **Any contention that the testimony of the defendant's wife would have led to an acquittal is without merit. Not only is the evidence discussed *ante* such that a conviction would be virtually assured on retrial, but the role of the wife in what transpired would make her an incredible witness.** Inexplicably, she was not charged in Jacksonville despite wearing the one victim's clothes, shoes and jewelry, as well as the jewelry of the second victim. Further, she drove the vehicle as the defendant fled from the police in Jacksonville (App-361).

**Ground One - Omission B:** The defendant claims that counsel was ineffective for not conducting an adequate pretrial investigation, interview and deposition of his wife. This same sub-claim was raised under "Ground One - Omission A." This claim under this section is denied for the same reasons given under the preceding section.

One point, however, needs to be addressed on this claim. The defendant contends that he was at the Super Pawn & Gun Shop in Ocala on the day of the burglary at 10:05 a.m. This fact, if true, does not establish an alibi. First, the burglary could have occurred at any time between 7:00 a.m., when the defendant's mother left for work, and 9:00 a.m., when his sister returned home. Secondly, the items pawned were jewelry, which had been stolen from both the defendant's mother and sister. **Moreover, included among the items pawned are a gold cross and nugget, both of which the**

51

**defendant admitted stealing to Ms. Hiers. (App-390).**

The motion for postconviction relief is denied. The claims are without merit and the defendant fails to adequately allege or establish prejudice.

Ex. V at 4-12 (emphasis added; footnotes omitted).

As noted previously, upon Petitioner's appeal, the appellate court per curiam affirmed the trial court's order. Accordingly, the claim was rejected on the merits by the state trial and appellate courts. Thus, there are qualifying state court decisions. This ground should be addressed applying the deferential standard for federal court review of state court adjudications, as required by AEDPA. Upon a thorough review of the record and the applicable law, it is clear that Petitioner is not entitled to relief on the basis of this claim because the state courts' adjudications of this claim were not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Given Ms. Park and Mr. Swain's actions based on the record before this Court, defense counsels' performance was not deficient. Even assuming *arguendo* deficient performance by defense counsel, Petitioner has not shown prejudice. Petitioner has not shown that a reasonable probability exists that the outcome of the case would

have been different if his lawyers had given the assistance that Petitioner has alleged they should have provided. Thus, the ineffectiveness claim is without merit.

### D. Ground Five

As ground five, Petitioner contends that trial counsel was ineffective for failure to object when the State substantially prejudiced the defense by informing the jury that Petitioner stole a pistol while in commission of the burglary. Respondents acknowledge that Petitioner raised this claim in his first Rule 3.850 motion and on appeal of the Rule 3.850 motion. Response at 18. The trial court adjudicated this claim on the merits. In denying this claim, the trial court identified the two-prong Strickland ineffectiveness test as the controlling law and stated in pertinent part:

> In Ground Four, Defendant alleges that he was denied effective assistance of counsel because trial counsel failed to "object to, file a motion in limine, move for a mistrial or preserve for appellate review" the State's introduction of impermissible collateral crime evidence, i.e., the alleged theft of a .25 caliber Beretta pistol while in the commission of a Burglary of a Dwelling. Defendant claims that he was not on trial for this crime[,] and it was not charged in the Information. Therefore, this was improper *Williams Rule* evidence and should have not been introduced at trial by the State.
>
> . . . .
>
> The Court finds that Defendant's Ground Four claim is legally insufficient as it is based on speculation and conclusory

allegations.   First,  the  Court  finds  that  the
testimony  by  Leslie  Parent  concerning  the
theft of the gun is neither collateral crimes
evidence nor *Williams Rule* evidence.   Section
90.404(2)(a), Florida Statutes (1997) provides
that "[s]imilar fact evidence of other crimes,
wrongs, or acts is admissible when relevant to
prove a material fact in issue, such as proof
of motive, opportunity, intent, preparation,
plan,  knowledge,  identity,  or  absence  of
mistake or accident, but it is inadmissible
when the evidence is relevant solely to prove
bad   character   or   propensity."   <u>See</u>   <u>also</u>
<u>Williams v. State</u>, 110 So.2d 654 (Fla.), <u>cert</u>.
<u>denied</u>, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed2d
86  (1959).    In  the  instant  case,  as  the
Information   demonstrates,   Defendant   was
charged and brought to trial on Burglary of a
Dwelling,  when  he  "unlawfully  enter[ed]  or
remain[ed] in a certain dwelling . . . without
the  consent  of  Leslie  Parent,  the  owner  or
custodian thereof, while harboring the intent
to  commit  the  offense  of  theft  within  said
dwelling."  Any fact relevant to prove a fact
in issue is admissible into evidence unless
its    admissibility    is    precluded    by    some
specific rule of exclusion.   <u>Sexton v. State</u>,
697 So.2d 833 (Fla. 1997).   Therefore, the
State   could   present   all   relevant   testimony
concerning  the  alleged  stolen  gun.    [<u>S</u>]ee
<u>State v. Taylor</u>, 648 So.2d 701 (Fla. 1995);
<u>State v. Meador</u>, 674 So.2d at 826; <u>see</u> §
90.403,   Fla.   Stat.   (1997);   Charles   W.
Ehrhardt,  Florida  Evidence  §  401.1  at  95-96
(1994) (footnote omitted) ("The concept of
'relevancy'  has  historically  referred  to
whether the evidence has any logical tendency
to prove or disprove a fact.  If the evidence
is  logically  probative,  it  is  relevant  and
admissible unless there is a reason for not
allowing the jury to consider it.").   Further
Defendant has not sufficiently alleged facts
that demonstrate that the testimony concerning
the gun should have been excluded despite its
relevancy.  [<u>S</u>]ee  section  90.403,  Florida
Statutes (1997).  Thus, this Court finds that
an attorney cannot be ineffective for failing
to  inform  the  Court  about  an  issue  that  is

> without merit.  *See* <u>Harvey v. Dugger</u>, 656
> So.2d 1253, 1258 (Fla. 1995); <u>Swafford v.
> Dugger</u>, 569 So.2d 1264, 1266 (Fla. 1990); <u>King
> v. Dugger</u>, 555 So.2d 355, 357-58 (Fla. 1990).
> An attorney should raise any honestly
> debatable issue that may aid his client's
> position, but he is not obligated to raise
> every conceivable issue, and certainly not
> when he regards argument as futile because of
> its lack of merit.  <u>Magill v. State</u>, 457 So.2d
> 1367, 1370 (Fla. 1984).

Ex. J at 366-68 (footnotes omitted).

As noted previously, upon Petitioner's appeal, the appellate court per curiam affirmed the trial court's order.  Accordingly, the claim was rejected on the merits by the state trial and appellate courts.  Thus, there are qualifying state court decisions.  This ground should be addressed applying the deferential standard for federal court review of state court adjudications, as required by AEDPA.  Upon a thorough review of the record and the applicable law, it is clear that Petitioner is not entitled to relief on the basis of this claim because the state courts' adjudications of this claim were not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Given defense counsel's actions based on the record before this Court, defense counsel's performance was not deficient.  Even assuming *arguendo* deficient performance by defense counsel,

Petitioner has not shown prejudice.  Petitioner has not shown that a reasonable probability exists that the outcome of the case would have been different if his lawyer had given the assistance that Petitioner has alleged he should have provided.  Thus, the ineffectiveness claim is without merit.

Therefore, the Petition will be denied and this case will be dismissed with prejudice.

Accordingly, it is now

**ORDERED AND ADJUDGED:**

1.   Petitioner's Motion for Extension of Time to File [a] Reply to Respondents' Response to Motion for Summary Judgment (Doc. #74) is **DENIED.**

2.   Petitioner's Motion for Summary Judgment (Doc. #52) is **DENIED.**

3.   The Amended Petition (Doc. #12) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE.**

4.   The Clerk of the Court shall enter judgment denying the Amended Petition and dismissing this case with prejudice.

5.   The Clerk of the Court shall close this case.

**DONE AND ORDERED** at Jacksonville, Florida, this 13th day of March, 2007.

TIMOTHY J. CORRIGAN
United States District Judge

sc 3/12
c:
Robert E.H. Carlisle
Ass't Attorney General (Hagan)